IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

James Hartman and Joanne Shank,  :
Co-Administrators of the Estate of  :
Mildred M. Hartman, deceased, and  :
James Hartman and Joanne Shank,  :
in their own right,  :
          Plaintiffs,  :
  :  Docket No.: 3:14-cv-02167
       v.  :  (Magistrate Judge Saporito)
  :
Sabor Healthcare Group  and  :
Whitestone Healthcare Group, LLC,  :
i/t/a Whitestone Care Center,  :
         Defendants.  :  JURY TRIAL DEMANDED

## MEMORANDUM

This diversity action is brought by James Hartman and Joanne
Shank (the "plaintiffs") in their own right and as co-administrators of the
Estate of Mildred M. Hartman, deceased, against Sabor Healthcare Group
and Whitestone Healthcare Group, LLC.

The action arises out of the care and treatment received by Mildred
M. Hartman (the "decedent") while she was an inpatient at the
Whitestone Care Center ("Whitestone") located in Stroudsburg, Monroe
County, Pennsylvania. The decedent was a resident of Whitestone from
February 12, 2014 through March 7, 2014 after she was released from the
Pocono Medical Center. (Doc. 1 ¶9). The plaintiffs alleged that while she

was a patient at Whitestone, the defendants failed to give the decedent appropriate medication and prescribed rehabilitation. As a result, her condition worsened, which ultimately resulted in her death on May 10, 2014 at 67 years of age. The plaintiffs' complaint consists of six counts: wrongful death, a survival claim, negligence, vicarious liability, corporate negligence, and intentional infliction of emotional distress. The defendants have moved to dismiss the action and to compel arbitration (Doc. 8) of the plaintiffs' claims pursuant to the terms of a Resident and Facility Arbitration Agreement (the "arbitration agreement").

I.    Background

The decedent was a resident of Whitestone from February 12, 2014 through March 7, 2014 after she was released from the Pocono Medical Center. (Doc. 1 ¶9). As her condition worsened, the decedent was rehospitalized at Pocono Medical Center. (Doc. 1 ¶16). The plaintiffs aver that while the decedent was a patient at the Whitestone facility, its staff failed to provide her adequate care which included the failure to properly administer her medication and prescribed rehabilitation. (Id. ¶¶17, 25-30). As a result, she developed swelling, increased fluid and suffered

from congestive heart failure. (<u>Id.</u> ¶17.) The plaintiffs claim that the treatment rendered by the Whitestone staff caused her to develop weeping lacerations of her legs, anxiety and panic attacks, physical and emotional injuries, and ultimately heart failure and death. (<u>Id.</u> ¶¶18,19, and 21).

On January 12, 2015, the defendants filed a Rule 12(b)(6) motion to compel arbitration. (Doc. 8). In the motion, the defendants assert that on or about the date of the decedent's admission to the Whitestone facility, she signed the arbitration agreement which was attached to the motion. (Doc. 8-4). The defendants assert that the arbitration agreement is governed by the Federal Arbitration Act ("FAA") and the application of federal case law. (Doc. 9, at 4). The arbitration agreement is entitled "Resident and Facility Arbitration Agreement (Not A Condition of Admission-Read Carefully)" and is set out in capital letters (Doc. 8-4). The decedent purportedly signed the agreement but did not date her signature. However, the introductory paragraph of the agreement indicates that the agreement was entered into on "2/12, 2014." (<u>Id.</u>) The Agreement states that, the parties agreed to settle "any legal controversy, dispute, disagreement or claim of any kind now existing or occurring in

the future between the parties arising out of or in any way relating to this Agreement or the Resident's stay." (Id.) The claims to be arbitrated included, but were not limited to the following:

> breach of contract, negligence, medical malpractice, wrongful death, tort, breach of statutory duty, resident rights, any consumer relief statue (sic), and any departures from the standard of care. This includes claims against the Facility, its employees, agents, officers, directors, any parent, subsidiary or affiliate of the Facility.

(Doc. 8-4, at 2). In addition, the arbitration agreement provided that the arbitration shall be conducted by National Arbitration and Mediation ("NAM"), the NAM Code of Procedure shall be utilized,[1] and the agreement to arbitrate disputes and the arbitration shall be governed by FAA. (Id. at 2-3). Finally, the agreement contained an acknowledgment in italicized capitalized letters as follows:

> *THE PARTIES UNDERSTAND THAT BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE ANY*

---

[1] The agreement states that NAM's pertinent rules and forms arelocated at NAM's website or by calling its toll-free telephone and fax numbers, or its address in Garden City, New York. (Id.).

*CLAIM DECIDED IN A COURT OF LAW
BEFORE A JUDGE AND JURY, AS WELL AS
ANY APPEAL FROM A DECISION OR AWARD
OF DAMAGES.*

(Id. at 3).

Following a telephonic case management conference with counsel for the parties, we ordered that the motion to dismiss be held in abeyance and the parties were granted leave to engage in discovery on the question of arbitrability. (Doc. 25). The order limited discovery to the issues of whether the decedent signed the arbitration agreement and whether the decedent lacked the capacity to know and understand the nature and extent of the agreement. (Id.) Following the completion of discovery, the parties have filed their final respective written submissions. The matter is now ripe for disposition. For the reasons that follow, we will defer ruling on the motion and order a trial pursuant to 9 U.S.C. § 4 to determine whether the decedent executed the arbitration agreement.

III.  Legal Standards

When deciding a motion to compel arbitration, a district court may rely either upon the standards governing motions to dismiss under Fed. R. Civ. P. 12(b)(6) or the standards governing motions for summary

judgment supplied by Fed. R. Civ. P. 56.  <u>Guidotti v. Legal Helpers Debt Resolution LLC</u>, 716 F.3d 764, 771-76 (3d Cir. 2013).  Under <u>Guidotti</u>, the Third Circuit has provided guidance as to which standard may be appropriate under the given circumstances in a particular case as follows:

> When it is apparent, based on the face of the complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.  But if the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the questions of arbitrability before a court entertains further briefing on the question.

<u>Id.</u> at 776 (citation omitted) (internal quotation marks omitted).  As the parties conducted discovery on the issue of arbitrability, we shall decide the issue before us under a summary judgment standard.  <u>Id.</u>

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" only if it might affect the

outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson</u>, 477 U.S., at 248.  In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." <u>Pastore v. Bell Tel. Co. of Pa.</u>, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." <u>Anderson</u>, 477 U.S. at 251-52.

III.  <u>Discussion</u>

On the basis of the written submissions by the parties, we are asked

to resolve the following issues:

    a.    whether the arbitration agreement was properly executed;

    b.    whether the decedent understood the nature and extent of the agreement, if in fact she executed it; and

    c.    whether the arbitration agreement is otherwise enforceable.

During the discovery phase of the resolution of the motion, the parties took three depositions: James Hartman (Doc. 26-1), Joanne Shank (Doc. 26-2), and Rachel Verde. (Doc. 26-3).

In deciding the issues before us, we are guided by the following rules. The FAA provides in part as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. It is undisputed that the arbitration agreement evidences a transaction involving commerce.

The FAA "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." Glover ex rel. Glover v. Darway Elder Care Rehab. Ctr., Civil No. 4:13-cv-1874, 2014 WL 931459, at *5 (M.D. Pa. Feb. 4, 2014); Century Indem. Co. v. Certain Underwriters at Lloyds, London, 584 F.3d 513, 522 (3d Cir. 2009). Congress enacted the FAA in order "to overrule the judiciary's long standing reluctance to enforce agreements to arbitrate and its refusal to put such agreements on the same footing as other contracts, and in the FAA expressed a strong federal policy in favor of resolving disputes through arbitration." (Id.) (citations omitted). Because arbitration is a contractual matter, prior to compelling arbitration under the FAA, a court must first determine that (1) an enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement. Id.; Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 160 (3d Cir. 2009). Pisano v. Extendicare Homes, Inc., 77 A.3d 651, 654 (Pa. Super Ct. 2013). Arbitration should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved

in favor of coverage." <u>First Liberty Inv. Grp. v. Nicholsberg</u>, 145 F.3d 647, 653 (3d Cir. 1998). "Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938). The scope of the state contract law is the type of matter in which the federal court must apply the law of the state. <u>Northern Health Facilities v. Batz</u>, 993 F. Supp. 2d 485, 494 (M.D. Pa. 2014).

(A)    <u>The Purported Signature of Mildred M. Hartman</u>

The plaintiffs maintain that the arbitration agreement is voidable because  the  decedent "either did not sign or was forced to sign these documents without being given the opportunity to read and understand the nature and extent of this agreement." (Doc. 27, at 2). "Absent a showing of fraud or mental incompetence, 'a person who signs a contract cannot avoid his obligations under it by showing that he did not read what he signed.'" <u>Sarbak v. Citigroup Glob. Mkts., Inc.</u>, 354 F. Supp. 2d 531, 541 (D.N.J. 2004). In support of their position, the plaintiffs deposed Rachel Verde, the former admissions and marketing director of

Whitestone.[2]   Upon the decedent's admission to Whitestone on February
12, 2014, Ms. Verde apparently was the Whitestone representative who
reviewed the admission documents with her as well as the arbitration
agreement.  However, Ms. Verde testified that she had no recollection of
the decedent.  Also she did not recall where the documents were allegedly
presented to the decedent and signed by her. (Doc. 26-3, at 15, 17).
However, the most significant testimony from Ms. Verde involved the
comparison of the purported signatures of the decedent on the admission
documents and the arbitration agreement. (Id. at 24-27).  She stated that
the alleged signatures of the decedent looked the same on Exhibit 2
(Consent for Physician Care), Exhibit 3 (Vaccine Consent), and Exhibit 4
(Financial Consent to Ancillary Services).   She admitted that those
signatures did not look like the purported signature of the decedent on
Exhibit 1 (arbitration agreement). (Doc. 26-3, at 24-27; Doc. 31-2, at 56-
61). Exhibit 2 does not contain a date. (Doc. 31-2, at 59).  Further, she
testified about the usual procedure she employed when she reviewed the
admission documents with patients, but could not remember any specifics

---

[2] Ms. Verde was employed at Whitestone from June 2012  through
October 2014. (Doc. 26-3, at 10).

as it related to the decedent.

Plaintiff John Hartman, the decedent's son, testified that he had no knowledge of his mother signing the arbitration agreement. (Doc. 26-1, at 49). He did not know if the purported signature of Mildred M. Hartman was, in fact, her signature. (<u>Id.</u>). He was provided with a copy of the entire admission packet for the 2014 admission and testified that he never saw the arbitration agreement before. (Doc. 26-1, at 53; Doc. 31-1, at 139-87). He had no knowledge that his mother signed an arbitration agreement in 2014. (Doc. 26-1, at 62).

Plaintiff Joanne Shank, the decedent's daughter, testified that she was able to recognize her mother's signature. (Doc. 26-2, at 25). She was unsure whether the signature on the arbitration agreement was, in fact, the decedent's signature. (Doc. 26-2, at 45, 59; Doc. 31-1, at 138). Although she had no reason to believe that it was not her mother's signature, she "can't really tell" because "it looks a little sloppy." (Doc. 26-2, at 45). When presented with a copy of the 2014 admission packet, Ms. Shank was unable to recognize the signature as the decedent's because "it's so sloppy." (<u>Id.</u> at 47). Also, with respect to Exhibit 2 (Consent for

Physician Care), Exhibit 3 (Vaccine Consent), and Exhibit 4 (Financial Consent to Ancillary Services) referenced in Ms. Verde's deposition, Ms. Shank stated that the purported signatures of Mildred M. Hartman contained thereon did not look like the decedent's signature. (Id. at 59). Further, she testified that she did not know whether her mother signed those documents. (Id. at 62). Finally, Ms. Shank testified that her mother used reading glasses to read. (Id. at 60). The decedent did not have her reading glasses with her upon her admission to Whitestone between 6:30 and 7:30 p.m. on February 12, 2014. Ms. Shank arrived at Whitestone about 9:00 p.m. that evening with her mother's reading glasses. (Id. at 33, 60).[3]

Based upon the deposition testimony regarding whether the decedent, in fact, signed the arbitration agreement, we find that there exists a genuine dispute of material fact. Under Section 4 of the FAA, we are satisfied that the making of the agreement for arbitration is in issue and therefore we shall proceed to trial on this issue. 9 U.S.C. § 4. As the

_____

[3] Ms. Verde testified that she reviewed the admission documents including the arbitration agreement with the decedent between 6:00 p.m. and 7:00 p.m. on February 12, 2014. (Id. at 65; Doc. 26-3, at 15).

plaintiff has previously demanded a jury trial, we will order that a jury shall hear and determine the issue. Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 112 (3d Cir. 2000) ([W]hen the very existence of [an arbitration] agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold questions of whether the arbitration agreement exists."); Deputy v. Lehman Bros., Inc., 345 F.3d 494, 509-10 (7th Cir. 2002) ("Section 4 thus required the court to hold a trial if the making of the arbitration agreement was in issue."); Hartford Life and Accident Ins. Co. v. Hayes, Civil No. 1:13-cv-02240, 2014 WL 4916200 at *3 n.1 (M.D. Pa. Sept. 30, 2014) (noting that, here authenticity of a decedent's signature is questioned, a disputed issue of material fact exists, precluding summary judgment). At the Section 4 trial, the parties are permitted to present both expert and nonexpert opinion testimony or other competent evidence to support a finding that the signature is genuine. See generally F.R.E. 901.[4] Our inquiry, however, does not end there.

---

[4] We caution the parties that expert testimony is subject to F.R.E. 702 and the principles enunciated by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc. 509 U.S. 579, 593-95 (1993).

(B)   The Decedent's Capacity to Know and Understand the
Nature and Extent of the Arbitration Agreement

In our order of March 17, 2015 (Doc. 25), in addition to allowing the

parties to engage in discovery on the issue of whether the decedent signed

the arbitration agreement, we also permitted discovery on the issue

whether the decedent lacked the capacity to know and understand the

nature and extent of the agreement.  In the event the trier of fact

determines that the decedent signed the arbitration agreement, the

decedent's capacity to know and understand the nature and extent of the

arbitration agreement becomes relevant.

In deciding this issue, we are guided by the following rules.

Pennsylvania contract law determines whether the decedent had the

capacity to enter into the arbitration agreement in this case.  First

Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (explaining

that courts generally apply ordinary state-law contract principles in

deciding whether the parties have agreed to arbitration).  Under

Pennsylvania law, a contracting person is presumed competent to execute

a document, and thus a signed document yields a presumption that it

accurately expresses the state of mind of the signing party. <u>Taylor v. Avi</u>, 415 A.2d 894, 896 (Pa. Super. Ct. 1979). The burden of amassing sufficient evidence of invalidity to justify submission of the issue to the jury is a heavy one. To meet the burden, the evidence must be "clear, precise and convincing." <u>Elliott v. Clawson</u>, 204 A.2d 272, 273 (Pa. 1964.

> The witnesses must be found to be credible that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order and that their testimony is so clear, direct, weighty and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.....

As the Pennsylvania Supreme Court has further explained:

> Written instruments are not to be set aside except upon convincing testimony that their execution was tainted with fraud, either actual or constructive, or that the person so executing them did not have what the law considers sufficient mental capacity to do so. Contracts made with an incompetent before his adjudication as weakminded are voidable and can be avoided only on proper showing that he was incompetent at the time. When mental competency is at issue the real questions is the condition of the person at the very time he made the gift or executed the instrument. Competence is best determined by a person's words or acts. The testimony of persons who observed the alleged incompetent on the date in question is

generally superior to testimony as to observations made prior to and subsequent to that date. Ordinarily, competence is presumed and the burden of proof is upon the person who alleges the incompetence.

Weir ex rel. Gasper v. Estate of Ciao, 556 A.2d 819, 824 (Pa. 1989)(citations omitted).

The decedent's children (the plaintiffs) gave deposition testimony which included their observations and opinions regarding her mental status. Mr. Hartman testified that the decedent "was not in her right mind" at the time of her admission to Whitestone. (Doc. 26-1, at 31). He based his opinion on his observation that "she was not aware of her surroundings." (Id. at 32). He made his concerns known to the "head of admissions" three or four days after the decedent's admission to Whitestone. (Id. at 33-34). He explained to the Whitestone representative that if decisions had to be made, "we would all like to be included on the decisions" as his "mother was not in her right mind." (Id. at 34). He also spoke to the "head nurse" or the "director of nursing" about his concerns. In response, he was informed that his "mother was capable of making her own decisions." (Id. at 35). Also, he was concerned

about the decedent's lack of a short-term memory. (Id. at 36). He believed that she was never in a position to make her own decisions. (Id.). He never filed any guardianship papers on his mother's behalf in any court nor was he aware of anyone else initiating any such filing. (Id. at 38-39). He was informed that his mother was tested, which caused Whitestone to state that the decedent was able to make her own decisions. (Id. at 42). He did not know if the decedent drove in 2014 or whether she still maintained a driver's license. (Id. at 56). She was able to read, write, and understand English. (Id.). He neither discussed the admissions packet with her nor did she discuss it with him. (Id.).

Upon the decedent's admission to Whitestone on February 12, 2014, Ms. Shank had concerns regarding the decedent's memory. (Doc. 26-2, at 34). Her mother was not acting normal, "she was a little foggy," and "she didn't understand things." (Doc. 26-2, at 34). She did not remember some of Ms. Shank's children's names, where she was, or why she was there. (Id., at 35). At a meeting on February 17, 2014, Ms. Shank spoke with Whitestone staff members "Rachel," "Vicki," and "Ellen" about her observations of the decedent. (Id.). She related to them at the meeting

that she and her brother, James Hartman, wanted to be contacted if her mother had anything to do. (Id. at 36). They informed her that Whitestone was going to have Dr. Muthiah come to see her mother. (Id.). She also expressed her concerns about her mother's memory issues with her family doctor, Dr. Koshani. (Id. at 4.). She took her mother for an examination by Dr. Koshani, and he signed a prescription for Whitestone to perform a test. (Id. at 42). Other than the "fogginess," she had no other memory concerns. (Id. at 43). Neither she nor anyone else in her family made medical decisions for the decedent in 2014. (Id. at 44). The decedent discussed with Ms. Shank her desire to file a suit against Whitestone in March 2014 was the decedent's decision to file suit. (Id. at 52; Doc. 31-1, at 135). From February through May 2014, the decedent was not diagnosed with dementia or Alzheimer's disease. (Id. at 55). The decedent did not receive any diagnosis related to her memory (Id.).

"Where mental capacity is at issue, the real question is the condition of the person at the very time he executed the instrument... in question." Sobel v. Sobel, 254 A.2d 649, 651 (Pa. 1969). Here, the only witness who would have been in a position to observe the decedent's

condition at the very time she allegedly executed the arbitration agreement was Ms. Verde. However, she testified that she has no specific recollection of the decedent nor does she recall where the decedent allegedly signed the documents. (Doc. 26-3, at 15, 17). In addition, neither Mr. Hartman nor Ms. Shank were present at Whitestone at the very time of the decedent's admission to the facility. Although Mr. Hartman and Ms. Shank testified about the decedent's lapses of memory such that she could not recognize some family members, "[f]ailure of memory does not prove incapacity unless it is total or so extended as to make incapacity practically certain." In re Lawrence's Estate, 132 A. 786, 789 (Pa. 1926). "Thus, one may suffer a defect in memory, but the other faculties of the mind may be unimpaired such that the capacity to understand the nature and character of business transactions remains." Taylor, 415 A.2d at 897. The decedent continued to make medical decisions for herself as well as the decision to bring suit against Whitestone by causing a praecipe for writ of summons to be filed in the Monroe County Court of Common Pleas in March 2014. (Doc. 31-1, at 135). In addition, she continued to treat with her family doctor and at

no time did her family doctor suggest that she had a memory deficit sufficient to cause him to record a diagnosis thereof. Under the circumstances, we find that the plaintiffs have not sustained their burden of amassing "clear, precise, and convincing" evidence of invalidity sufficient to justify submission of the issue to a jury. See Elliott, 204 A.2d at 273, Weir, 556 A.2d at 824.

(C)   Enforceability of the Arbitration Agreement

In the event that the trier of fact determines that the decedent executed the arbitration agreement, we must then determine whether this entire action falls within the scope of the agreement to arbitrate. We must look to Pennsylvania law to determine the scope of the arbitration agreement. See Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475-76 (1989).

Paragraph A of the arbitration agreement set forth above is extremely broad in scope and would appear to require arbitration of a negligent care claim. However, "only parties to an arbitration agreement are subject to arbitration." Pisano, 77 A.3d at 661. In Pisano, the Superior Court of Pennsylvania held that a wrongful death action is a

separate action belonging to the decedent's beneficiaries, rather than the decedent herself. While it derives from the same tortious conduct, it is not derivative of the decedent's rights. Id. at 663. As a consequence, the arbitration agreement in Pisano did not bind the wrongful death beneficiaries who were non-signatories to the arbitration agreement. See id.

This same scenario presented itself to this court in Batz. In Batz, the wife of a decedent brought suit in state court individually and as administratrix of her husband's estate against a nursing facility. The wife brought both wrongful death and survival action claims against the facility. It was alleged that while her husband was a resident at the nursing facility, he developed a deep tissue injury which deteriorated into a large open wound, and he died as a result after he was discharged to a hospital. Upon the husband's admission to the nursing facility, his wife signed an alternative dispute resolution agreement that provided that all disputes be resolved by mediation and, if not successful, by binding arbitration. The nursing facility filed a motion in federal court to stay the state court action and compel arbitration. Under those facts, Judge

Mariani of this court bifurcated the wrongful death claims from the survival action and compelled arbitration as to the survival claims only. Batz, 993 F. Supp. 2d at 497.  In doing so, the court held that Pisano represented the law of Pennsylvania and observed that the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement."  Batz, at 496 (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20 (1983)).

Recent decisions of the Superior Court after Batz was decided held that the FAA did not preempt state law mandating consolidation of wrongful death and survival actions and further bifurcation of wrongful death and survival actions was not required.  E.g., Taylor v. Extendicare Health Facilities, Inc., 113 A.3d 317, 325 (Pa. Super. Ct. 2015); Tuomi v. Extendicare, Inc., _ _ _ A.3d _ _ _ _, 2015 WL 3791409 at *3 (Pa. Super. Ct. June 18, 2015).   Pisano, Taylor, and Tuomi each considered arbitration agreements between a nursing home and its deceased resident.  As in those cases, the decedent here could not alienate her children's rights to a wrongful death recovery.  Therefore, the wrongful death claim is outside the scope of the arbitration agreement.

We are left to determine whether the wrongful death claim should be bifurcated from the survival claims. As we indicated above, this court bifurcated the wrongful death claims from the survival claims in <u>Batz</u>. Although the Superior Court of Pennsylvania in <u>Taylor</u> and <u>Tuomi</u> held that bifurcation was not required, it made those rulings on the basis of a state civil procedural rule mandating consolidation of a wrongful death action with a cause of action for the injuries of a decedent which survives his or her death. <u>See</u> Pa. R. Civ. P. 213(e).

We acknowledge that the state court in <u>Taylor</u> and <u>Tuomi</u> held that the FAA did not preempt Pa. R. Civ. P. 213(e). But we are not bound by the Superior Court's interpretation of the FAA. <u>United States v. Bedford</u>, 519 F.2d 650, 654 n.3 (3d Cir. 1975) ("It is a recognized principle that a federal court is not bound by a state court's interpretation of federal laws . . . ."). Pennsylvania Rule 213 would prevent the execution of a valid arbitration agreement and therefore it is preempted by the FAA and has no effect on this case. <u>Golden Gate Nat. Senior Care, LLC v. Beavens</u>, _ _ _ F.Supp. 3d _ _ _ _, 2015 WL 5000886 at *9 (E.D. Pa. Aug. 20, 2015). The <u>Beavens</u> court observed the following:

> Since this case is in federal court by reason of diversity of citizenship, it would appear that the Erie doctrine would resolve whether Rule 213 applies to this case. However, the FAA established a body of substantive federal law. Federal law provides the rules of decision in FAA actions, and the Erie doctrine does not apply.

Beavens, 2015 WL 5000886 at *9 n.11. (citing Prima Paint Corp. v. Flood Conklin Mfg. Co., 388 U.S. 395, 405-06 (1967), and Moses H. Cone Mem'l Hosp., 460 U.S. at 23. The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Perry v. Thomas, 482 U.S. 483, 489-90 (1987). The FAA preempts state rules that "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." Southland Corp. v. Keating, 465 U.S. 1, 10 (1984). An arbitration agreement is revocable "upon such grounds as exist at law or in equity for the revocation for any contract." 9 U.S.C. §2. The grounds available for revocation do not include "a State's mere preference for procedures that are incompatible with arbitration and would wholly eviscerate arbitration agreements." AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1748 (2011).

"Therefore, state rules which interfere with or stand as an obstacle to the execution of a valid arbitration agreement are preempted by the FAA." Beavens, 2015 WL 5000886, at *9.

The Commonwealth of Pennsylvania's interest in streamlining the resolution of both survival and wrongful death claims which is expressed by Rule 213 is a policy decision which must give way to the FAA's overriding goal to "ensure judicial enforcement of privately made agreements to arbitrate." AT&T Mobility 131 S. Ct. at 1749. When a defendant has two substantive disputes with separate plaintiffs arising from the same incident, and only one of those plaintiffs is subject to an arbitration agreement, then, as a matter of law under the FAA, the two claims must be heard in separate forums. Moses H. Cone Mem'l Hosp., 460 U.S. at 19-20. In that case, the Supreme Court stated:

> Under the Arbitration Act, an arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement. If [one of the disputes] is arbitrable under the Act, then the [defendants']two disputes will be resolved separately—one in arbitration, and the other (if at all) in state-court litigation.

Id. at 20.

Such piece-meal litigation is required "irrespective of any concomitant decline in judicial efficiency." <u>Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.</u>, 571 F.3d 299, 309 (3d Cir. 2009). Despite the practical problems of trying the case with similar issues in different forums, the Supreme Court and the Third Circuit precedents are clear that the policy of the FAA is not efficiency *per se*, but rather the promotion of arbitration, from which an incidental benefit is often, but not necessarily, efficiency. <u>See</u> <u>Volt</u>, 489 U.S. at 478, <u>George V. Hamilton</u>, 571 F.3d at 309.

Therefore, in the event that the trier of fact determines that the decedent executed the arbitration agreement, we will retain the wrongful death claim (count I) for further proceedings in this court, and dismiss the survival action claims (counts II-VI) in favor of arbitration proceedings. But if the trier of fact determines that the decedent did not execute the arbitration agreement, none of the counts will be subject to arbitration.

(D)   <u>Unconscionability</u>

The plaintiffs argue that the arbitration agreement is unenforceable

because it is unconscionable. To the extent that the principles of Pennsylvania law are not displaced by the FAA, we must apply those principles in the determination of unconscionability of an agreement to arbitrate. Quilloin v. Tenet HealthSystem Philadelphia, Inc., 673 F. 3d 221, 230 (3d Cir. 2012). "To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable." Id. at 220 (citing Salley v. Option One Mortg. Corp., 925 A.2d 115, 119 (Pa. 2007)).

A contract is substantively unconscionable when it "unreasonably favors the party asserting it." Quilloin, 673 F.3d at 230. The plaintiffs maintain that the facts upon which they rely to establish substantive unconscionability relate to the decedent's age (67), her hospitalization at the Pocono Medical Center's Intensive Care Unit, her transfer to Whitestone for rehabilitation, and allegations that she was unable to function, she was provided with an admission packet consisting of sixty pages at 6 p.m. on the evening she was admitted, she had a ninth-grade education, she was suffering from physical and emotional difficulties, and she was incapable of reading without her glasses. Other than the

testimony from Mr. Hartman and Ms. Shank, the plaintiffs have offered no evidence from any medical doctor that the decedent was unable to function and that she was suffering from any emotional difficulties. As we indicated above, the decedent was able to read, write, and understand the English language. Further, she was able to make medical decisions on her own behalf and she made a decision to bring suit against Whitestone in March 2014 as evidenced by the praecipe for writ of summons filed in the Monroe County Court of Common Pleas.

A contract is procedurally unconscionable when there was a "lack of meaningful choice" in the contract, which was formed through "oppression and unfair surprise." Quilloin, 673 F.3d at 235. "Procedural unconscionability pertains to the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999) (applying Pennsylvania law). "A contract is procedurally unconscionable where 'there was a lack of meaningful choice in the acceptance of the challenged provision.'" Quilloin, 673 F.3d at 235. In deciding procedural unconscionability, we

consider the "take-it-or-leave-it" nature of the standardized form of the arbitration agreement, the parties' relative bargaining positions, and the degree of economic compulsion motivating the adhering party. Id. at 235-36.

The arbitration agreement was not a "take-it-or-leave-it" document that the decedent was required to sign in order to receive care from Whitestone. The agreement made clear in bolded and capitalized letters at the top of the first page that entering into the agreement to arbitrate was not a condition of her admission to Whitestone. Moreover, the agreement further provided that the decedent had sixty days to reconsider her decision to agree to the arbitration process. There also appeared an acknowledgment stating that the decedent had an opportunity to ask questions about the agreement, propose edits to the agreement and seek legal counsel. Ms. Verde testified that it was her practice to read the arbitration agreement to new residents by reviewing it with them with a "fine-tooth comb." (Doc. 26-3, at 28-29). Although it appears that Whitestone would have been in a stronger relative bargaining position, the plaintiffs have not offered any evidence that this

stronger bargaining position created an undue influence upon the decedent. In any event, a contract is not unconscionable "simply because of a disparity in bargaining power." Quilloin, 673 F.3d at 235. The plaintiffs did not present any evidence of economic compulsion.

The plaintiffs argue that the arbitration agreement is procedurally unconscionable "based on the documents themselves and with the manner in which it (sic) was presented to the decedent." (Doc. 27, at 11). In addition, the plaintiffs maintain that the decedent had no choice but to sign it as she was unable to move facilities at the time it was presented. Finally, the plaintiffs claim that the admission packet was unduly lengthy and rife with small print and multiple documents requiring signatures and comprehension. The photocopy of the arbitration agreement produced in discovery appears to be printed in a normal font. Also, the plaintiffs testified that the decedent was able to read the English language. Ms. Verde also stated that it was her practice to review "with a fine tooth comb," the terms of the arbitration agreement with an incoming resident. (Doc. 26-3, at 28-29). The plaintiffs have not produced any evidence that shows that the decedent was affirmatively

misled by Whitestone or otherwise coerced into signing the arbitration agreement.  See In re Estate of Boardman, 80 A.3d 820, 823 (Pa. Super. Ct. 2013) ("[I]n the absence of fraud, the failure to read a contract before signing it is 'an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract.'" (quoting Germantown Sav. Bank v. Talacki, 657 A.2d 1285, 1289 (Pa. Super. Ct. 1995)).  The plaintiffs have not carried the burden of showing that the arbitration agreement is substantively or procedurally unconscionable.

An appropriate Order follows.

<u>**s/ Joseph F. Saporito, Jr.**</u>
**JOSEPH F. SAPORITO, JR.**
**United States Magistrate Judge**

**Dated: September 21, 2015**